DEAN V. NEAL

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-034-CV

WILLIAM H. DEAN AND MADELYN S. DEAN APPELLANTS

V.

FRANK W. NEAL & ASSOCIATES, INC., APPELLEES

HBC ENGINEERING, INC., DAVID LEWIS 

BUILDERS, INC., AND DAVID T. LEWIS, INDIVIDUALLY

------------

FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

This construction defect case involves multiple summary judgments granted on limitations grounds.  In three issues, William H. and Madelyn S. Dean contend that the trial court erred in granting summary judgments on their claims against appellees Frank W. Neal & Associates, Inc., HBC Engineering, Inc., David Lewis Builders, Inc., and David T. Lewis, individually, because the limitations period was tolled by application of the discovery rule and because the appellees are equitably estopped from asserting limitations as a result of their conduct.  Because the Deans failed to raise a fact issue on the discovery rule and equitable estoppel, we affirm the summary judgments for all of the appellees on limitations grounds. 

Background

On November 10, 1995, the Deans entered into a contract with Nader Design Group (NDG) and David Lewis Builders, Inc. (DLBI) for the construction of a home, James Nader of NDG was the architect for the project, and DLBI was the builder.  As part of the design process, the Deans’ architect hired Frank W. Neal & Associates, Inc., a structural engineering firm, to design the home’s foundation.  When preparing the design, Neal used some information in a soils report that HBC Engineering, Inc., another engineering firm, prepared in 1994 for a different architect.  The soils report indicated a potential for movement in the soil below the house of approximately 2.1 inches.  Consequently, Neal recommended that the house be designed with a suspended slab, or pier and beam, foundation.  The Deans rejected this recommendation because it was too costly, and Neal designed a foundation that was slab-on-grade with some piers.  According to Neal’s deposition testimony, he told Nader the new design would be less costly but not as good as a suspended slab.  Construction of the home took place in 1996.

During construction, Neal and the Deans noticed some cracks in the foundation.  Neal did not think the foundation was structurally compromised at that point, so he recommended that the cracks in the garage be repaired with an epoxy patch and that a flexible bed be laid under the tile in the other parts of the house where cracking had occurred.
(footnote: 1)  There is no evidence that Neal’s recommendations were implemented, but construction was completed, and the Deans closed on the house in December 1996. 

After they moved in, the Deans noticed cracks in the garage and “various places” in the house.  By October 1997, more cracks had appeared, and later that month Nader met with Neal, Lewis, and Ralph Barnes of HBC to discuss how to mitigate the problem.  At this meeting, the participants discussed chemically injecting the soil underneath the house to stop potential movement related to moisture in the soil caused by groundwater.  Mrs. Dean was aware of this meeting and its purpose.  In her deposition, Mrs. Dean admitted that she knew there had been some movement as of October 1997, which is why chemically injecting the soil was considered. 

Between 1998 and 2002, Nader met with various parties, including Neal and Barnes, regarding the home’s foundation.  The Deans believed that some or all of the appellees would pay for any necessary repairs to the home’s foundation.  But at a meeting on January 23, 2002, the Deans discovered that there was no general agreement among the appellees to pay for such repairs.   The Deans filed suit against NDG, Neal, DLBI, Lewis, and HBC on January 28, 2002.  They asserted negligence, breach of warranty, fraud, fraud-failure to disclose, fraud in a real estate action and fraud-false promise, DTPA, and breach of contract claims against the various parties.  They later nonsuited NDG, Nader’s architectural firm.
(footnote: 2)  Neal, DLBI and Lewis, and HBC subsequently filed separate motions for summary judgment contending that all of the Deans’ claims were barred by the applicable statutes of limitations.
(footnote: 3)  The Deans filed a third amended petition alleging that the discovery rule applied to their claims and that the appellees were equitably estopped from asserting limitations because their conduct induced the Deans not to file suit.  The trial court granted separate summary judgments in favor of each of the appellees.

Standard of Review

A defendant who moves for summary judgment on the affirmative defense of limitations has the burden to conclusively establish the defense.  
KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.
, 988 S.W.2d 746, 748 (Tex. 1999).  The defendant must, therefore, conclusively prove when the cause of action accrued.  
Id
.  Additionally, the defendant must negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury.  
Id
.  If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations.  
Id
.

Discovery Rule

The discovery rule is a limited exception to the statute of limitations.  
Computer Assocs. Int’l, Inc. v. Altai, Inc.
, 918 S.W.2d 453, 455 (Tex. 1996).  The discovery rule is applied when the nature of the injury is inherently undiscoverable.  
Id
. at 456.   Thus, the discovery rule should be applied only when “it is difficult for the injured party to learn of the negligent act or omission.”  
Id
.  A cause of action accrues when the plaintiff knew or should have known of the wrongful injury.  
KPMG Peat Marwick
, 988 S.W.2d at 749-50.  A plaintiff need not know the full extent of the injury before limitations begins to run.  
Murphy v. Campbell
, 964 S.W.2d 265, 273 (Tex. 1997).

Here, Mrs. Dean’s deposition testimony shows that the Deans first observed cracking in the garage in July 1996 while the house was under construction.  In an affidavit attached to the Deans’ summary judgment responses, Mrs. Dean testified that after they moved into the house, they noticed “more minor problems” with cracking in the garage and “various places” in the house, but they were assured that “these were normal cosmetic cracks that would occur with settlement of the [r]esidence.”  But there is no indication as to who assured them so.  Lewis’s affidavit states that after construction of the home was completed, he received a letter from Mr. Dean indicating that there had been movement in the foundation.  But he could not locate the original letter, and the Deans did not produce it.  The evidence also shows that by October 1997, when Nader began to call meetings regarding the problem, the parties had begun investigating chemically injecting the soil to dry up the moisture level.  According to Nader’s deposition testimony, the October 1997 meeting was called because the Deans noticed cracking in the dry wall in the house, indicating movement.  And Mrs. Dean admitted that she was aware at that time that movement in the soil precipitated this investigation.  

Mrs. Dean’s affidavit testimony indicates that several repairs were made in 1997 and 1998 and that in 1998 DLBI made repairs to the sheetrock.  In his affidavit testimony, Lewis stated that after the October 1997 meeting, he sent one of his employees to the house to dig a hole in front of the slab so that the parties could inspect it.  A January 27, 1998 memorandum written by Nader, which was copied to the Deans, says that in January, Nader conducted the third in a series of monthly meetings at the Deans’ house.  The memorandum states that Pro Chemical conducted “experimental probes” in December 1997, and that same month, holes were dug in the garage floor.  Nader indicates that Mrs. Dean reported to him on January 14, 1998 that water was present in one of the holes.  Thus, the evidence shows that no later than December 1997 the Deans themselves were aware that soil movement was causing cracking in their home to the extent that testing and monitoring of the foundation was necessary. 

The Deans contend that they could not have discovered the soil movement that caused the foundation problems until August 1998, when they received a report by an engineer that concluded the soil under the house had expanded more than HBC originally predicted.  The Deans say this report at least creates a fact issue as to whether they could have discovered the full extent of the problem before August 1998.  Until they received the report, they thought the foundation problems were only minor and could be repaired cosmetically.  Mrs. Dean’s summary judgment affidavit states that she “realized the foundation needed repairs” when she read the report.  But the Texas Supreme Court tells us that 

the discovery rule does not linger until a claimant learns of actual causes and possible cures.  Instead, it tolls limitations only until a claimant learns of a wrongful injury.  Thereafter, the limitations clock is running, even if the claimant does not yet know: 

•
 the specific cause of the injury;

•
 the party responsible for it;

•
 the full extent of it; or

•
 the chances of avoiding it.  

PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P’ship
, 146 S.W.3d 79, 93-94 (Tex. 2004) (footnotes omitted).  The summary judgment evidence shows that the Deans knew there was some cracking in the house and, thus, movement in the foundation in 1996 and 1997; they just did not know the extent of the work or expense necessary to repair it.  Moreover, Nader testified in his deposition that in October 1997, when the parties first began meeting to address these very concerns, the Deans could have hired an engineer to do the same type of engineering report that they eventually received in August 1998.  In addition, the summary judgment evidence supports the conclusion that Nader was acting as the Deans’ agent with regard to the investigation of the cause of the cracks in the home’s foundation;
(footnote: 4) thus, Nader’s knowledge of the foundation problems can be imputed to the Deans.  
See Gibson v. Bostick Roofing & Sheet Metal Co.
, 148 S.W.3d 482, 491 (Tex. App.—El Paso 2004, no pet.).  According to Lewis’s affidavit, the participants at the October 1997 meeting discussed that there was some movement in the foundation of the Deans’ home.  Thus, the evidence shows that Nader was aware of such movement as early as October 1997.  Accordingly, the evidence shows that the Deans knew or should have known of the injury to their home no later than October 1997.  Therefore, the statute of limitations began to run at that time so that by the time the Deans filed suit in January 2002, the limitations period had expired on all of their claims against the appellees.

Equitable Estoppel

The Deans also contend that they raised a fact issue as to whether the appellees were equitably estopped from asserting limitations.  The Deans contend that the appellees’ conduct induced them to believe that the appellees would pay for any necessary repairs to the home’s foundation.   The doctrine of equitable estoppel requires (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.  
Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.
, 962 S.W.2d 507, 515-16 (Tex. 1998).  Estoppel in avoidance of limitations may be invoked in two ways:  either a potential defendant conceals facts that are necessary for the plaintiff to know he has a cause of action or the defendant engages in conduct that induces the plaintiff to forego a timely suit regarding a cause of action that the plaintiff knew existed.  
Rendon v. Roman Catholic Diocese of Amarillo
, 60 S.W.3d 389, 391 (Tex. App.—Amarillo 2001, pet. denied).  The Deans contend that the appellees engaged in the latter.

In order for the Deans to raise a fact issue on their estoppel by conduct claim, they must have presented some evidence that the appellees’ conduct affirmatively induced them into delaying suit beyond the limitations period, unmixed with any want of diligence on their part.  
See id
.; 
Ladd v. Knowles
, 505 S.W.2d 662, 669 (Tex. App.—Amarillo 1974, writ ref’d n.r.e.).  “Implicit in this test are the requirements that the plaintiffs knew they had a cause of action, that the cause of action had accrued at the time the inducement occurred, and that their initial and continued reliance upon the original inducement was reasonable.”  
Rendon, 
60 S.W.3d at 391.  A plaintiff may not “blindly rel[y] upon a situation as being what it seemed rather than as being what it in reality was.”  
Leonard v. Eskew
, 731 S.W.2d 124, 129 (Tex. App.—Austin 1987, writ ref’d n.r.e.) (op. on reh’g).

According to Mrs. Dean’s affidavit, she did not seek legal counsel between August 1998 and December 2001

based upon:  (i) the numerous meetings between the Architect and other engineers and contractors; (ii) the work activity performed at the Residence to study the problem; (iii) the estimates for the repairs generated by Extra Mile Corporation; (iv) [her] understanding that once a repair plan was agreed upon, repairs would be made to the foundation at no cost to Mr. Dean and [her]; and (v) [her] respect and trust of the Architect and Builder.  If the meetings or work would have stopped, or it was communicated to [her] that [she and] Mr. Dean . . . were required to pay for some or all of the repairs to the foundation, [she] would have sought legal advice and filed suit, if that was necessary. 

The thrust of the Deans’ assertions that they raised a fact issue on equitable estoppel is that none of the appellees ever told the Deans that they would 
not
 pay for any and all necessary foundation repairs—not that any of the appellees affirmatively told the Deans they would pay for such repairs—and that that silence, along with the summary judgment evidence showing that the appellees had met about the foundation problem, hired professionals to investigate the source of the problem and provide price estimates for necessary repairs, and made at least some attempts to repair damage at no cost to the Deans, induced the Deans to forego filing suit until after the applicable limitations periods had expired.  The Deans do not claim that any appellee made any affirmative misrepresentation to prevent them from filing suit. 

However, the Deans specifically point to the following evidence to support their assertions:

• letters from Nader to the Deans informing them about his site checks at the house, the recommendation of the engineer who performed the 1998 site assessment, and the “plan of action for the project”;
(footnote: 5)
 • a December 15, 1999 letter from Nader to Timothy Potvin, Senior Claims Examiner for Lexington Insurance, Nader’s insurer, which states,

As you remember from the first mitigation project that was accomplished last year, we have exceeded our deductible for this claim.  We have forwarded copies of this proposal to . . . Neal . . . and . . . HBC for their review.  I have requested that the costs for this project be shared as was done on the earlier work with which you are familiar.  If you concur with our plan for this project, I will proceed to have an attorney negotiate a settlement agreement that might encompass release of all claims upon completion of this project and the following cosmetic repairs, which have not been estimated.
(footnote: 6) 

• a copy of what appears to be a check stub from Neal with the date “1-29-99,” the amount of “$3,000.00,” and “Dean residence” written on it, and a January 20, 1999 check request for $3,000 from Barnes, which appears to be on an HBC form, that says it is to NDG for “part of an agreement to mitigate movement [in] a house slab” and a letter to Nader stating the check is enclosed pursuant to his “January 13, 1999 transmitttal”;

• references in Mrs. Dean’s affidavit to letters from Nader (1) to the Deans regarding a plan that could be used to obtain pricing from contractors, (2) to Extra Mile Construction enclosing a floor plan of the property, project boundary, and structural drawings, stating, “We would like to begin this project sometime after the first of the year,” and (3) to Potvin dated March 2, 2001 that Dean’s affidavit says “further confirmed to us that the [appellees] had reached an agreement on a repair plan and that their insurance companies were aware of the plan and would assist in repairs”;
(footnote: 7) 

• a copy of a May 22, 2001 letter from Nader to James Schwartz, who the Deans contend is Lexington’s attorney, stating that a meeting is to be held among the parties and that the purpose of the meeting is “to come to an agreement on determining the success of the proposed project and its ramifications toward the conclusion of this matter”; 

• allegations in Mrs. Dean’s affidavit that Capshaw, HBC’s attorney, said at a June 2001 meeting that the insurance carriers wanted a commitment that they would be writing a check for an amount that would repair all of the problems and that he advocated releasing the original design team and letting the insurance carriers pay the new people to solve the problems; and 

• an August 23, 2001 letter from Nader stating that he had reviewed a design plan Mrs. Dean gave him, expressing concerns about issues that might be encountered executing that plan, and stating, “Otherwise, it looks as though you have a plan with which to proceed.  Let us know if there is anything else we can do to help move the process along.” 

Although this evidence suggests that there may have been an agreement among Nader, Neal, and HBC to undertake or to pay for some repairs to the residence, there is no evidence that the Deans were personally aware of any specific payments from Neal or HBC or that they were aware of any specific agreement among the appellees to pay for foundation repair to the home.  Moreover, although there is some evidence that Nader was acting as an agent for the Deans, there is no evidence that Nader was acting as agent for any of the appellees; thus, we do not believe that Nader’s letters to the Deans regarding plans for “the project” raise a fact issue as to whether the appellees’ conduct estopped them from asserting limitations. 

The rest of the evidence pointed to by the Deans raises a fact issue only as to whether HBC and Nader sought coverage from their insurance carriers for the damages now claimed by the Deans.  Although Nader’s 2001 letter to Schwartz, the attorney for Nader’s insurance carrier, states that “the parties” were to meet to discuss an agreement on the project, it does not state who the “parties” are, and there is no mention of Neal or Lewis and DLBI by name.  Nor is there any reference to their attorneys.  But Nader’s 1999 letter to Potvin, an adjuster for Nader’s insurance carrier, indicates that Nader sought coverage regarding the foundation problems.  And in her affidavit, Mrs. Dean references participation in a meeting by Capshaw, HBC’s attorney, and his statements about the conditions on which the insurance companies
(footnote: 8) would settle.  Thus, we conclude the evidence raises a fact issue only as to whether Nader and HBC sought insurance coverage for the claim.  The statement in Mrs. Dean’s affidavit that references a 2001 letter from Nader to Potvin and avers that it “further confirmed . . . that the [appellees] had reached an agreement on a repair plan and that their insurance companies were aware of the plan and would assist in repairs,” standing alone, is conclusory and, thus, not proper summary judgment evidence.  
See Seaway Prods. Pipeline Co. v. Hanley
, 153 S.W.3d 643, 653-54 (Tex. App.—Fort Worth 2004, no pet.).

Thus, the summary judgment evidence shows two courses of conduct by the appellees that the Deans rely on:  initial attempts to repair the foundation by Nader and the appellees, and attempts by Nader and HBC to have insurance companies pay for the more extensive repairs.  We do not believe this evidence raises a fact issue on the Deans’ equitable estoppel avoidance to appellees’ limitations defense.  

An unsuccessful effort to make repairs does not toll the statute of limitations for purposes of determining when a cause of action accrued.  
See Pako Corp. v. Thomas
, 855 S.W.2d 215, 219 (Tex. App.—Tyler 1993, no writ); 
see also Muss v. Mercedes-Benz of N. Am., Inc.
, 734 S.W.2d 155, 159-60 (Tex. App.—Dallas 1987, writ ref’d n.r.e.) (applying same rule to equitable estoppel case, but relying on case analyzing when cause of action accrued).  And we have not found any cases in which the mere making of repairs, without more, estopped a defendant from asserting limitations.  
See, e.g., Gibson v. John D. Campbell & Co.
, 624 S.W.2d 728, 730, 732-33 (Tex. App.—Fort Worth 1981, no writ) (holding that builder was estopped from asserting limitations when builder made initial repair to home and assured homeowner problem was repaired and, after homeowner discovered foundation problems, repeatedly assured homeowner that repairs would be made, sent agent to home to take out ruined carpet and floorboards, and offered to pay for forty percent of cost of replacement carpet).  We believe such a rule would discourage parties providing goods and services from extending warranties and attempting to repair minor problems without first conducting an extensive investigation to determine liability.  Thus, we conclude that appellees’ attempts to make initial repairs to the residence do not raise a fact issue as to equitable estoppel.

Further, absent fraud or bad faith, statements made during settlement negotiations do not waive a defendant’s right to assert limitations.  
Compare Lockard v. Deitch
, 855 S.W.2d 104, 105-06 (Tex. App.—Corpus Christi 1993, no writ) (holding statement in letter from defendant’s insurance carrier to plaintiff stating, “Once you have the final specials and medical reports to submit to us for evaluation, we will try to work towards a settlement with you,” did not raise fact issue on plaintiff’s equitable estoppel claim) 
with Frank v. Bradshaw
, 920 S.W.2d 699, 702-03 (Tex. App.—Houston [1st Dist.] 1996, no writ) (holding that insurance adjuster’s statement to plaintiffs that if they sent him their bills, he would pay them, raised a fact issue as to whether defendant was estopped from asserting limitations).  Thus, we do not believe that Nader’s and HBC’s seeking insurance coverage is conduct that could have reasonably induced the Deans into delaying suit.  On the contrary, such conduct should have alerted the Deans that Nader and HBC thought the Deans’ claims were actionable.

We do not wish to appear unsympathetic to the Deans.  Their willingness to give appellees the opportunity to attempt a resolution of this matter without hastily resorting to litigation is admirable.  But however admirable, the Deans’ reliance on the appellees’ conduct presented as summary judgment evidence does not support their equitable estoppel argument.  That evidence indicates that the majority of the conduct relied upon by the Deans was attributable to Nader, rather than the appellees.  It also indicates that Nader was acting as the Deans’ agent throughout the time the Deans allege they were induced into delaying their lawsuit.

Viewing the evidence in the light most favorable to the Deans, we conclude that it does not raise a genuine issue of material fact on their assertion that the appellees are equitably estopped from asserting limitations.  Thus, the trial court did not err in granting summary judgment as to all causes of action and as to all of the appellees on limitations grounds.  We overrule the Deans’ first issue.

Conclusion

Having determined that the trial court did not err in granting summary judgment for all of the appellees on limitations grounds,
(footnote: 9) we affirm the trial court’s summary judgments in favor of the appellees on the Deans’ claims. 

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and MCCOY, JJ.

DELIVERED:  May 19, 2005

FOOTNOTES
1:
The laundry room, kitchen area, entry, and master bedroom. 

2:
The Deans never sued their architect, Nader, individually.

3:
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 §§ 16.003 (two years), 16.004 (four years) (Vernon 2002).

4:
In his deposition, Nader testified that the October 1997 meeting was called because the Deans “had noticed cracking in their floor slab and movement or -- or cracking in drywall that indicated that there might be movement of the foundation” and that 
they called him
.  Additionally, the summary judgment record indicates that Nader coordinated all of the meetings and investigations regarding the home’s foundation problems and obtained all plans and pricing for any proposed mitigation.  In fact, the 1998 engineering report—which the Deans claim is the first indication they had that the soil had caused foundation movement—was addressed to Nader, and Nader admitted that he hired the engineer to prepare the report and paid his bills. 

5:
One of these letters, dated September 28, 1999, states that Ralph Barnes of HBC “is in the process of reviewing the attached site plan, which indicates the proposed location of 3 monitoring wells and 1 permanent bench mark.  These items have been recommended by [the 1998 site assessment engineer] to monitor pre and post construction water levels.  Ralph will help to develop the implementation of this element.” 

6:
There is no evidence that the Deans were copied with or otherwise informed about this letter or its contents.

7:
These letters are not in the appellate record.

8:
Mrs. Dean’s affidavit does not specify which insurance companies Capshaw was referring to.

9:
Because we have determined that the trial court did not err in granting summary judgment on limitations grounds, we need not address the Deans’ second and third issues that contend the trial court erred in granting summary judgment on substantive grounds.  
See
 
Tex. R. App. P.
 47.1.